**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**MARLONE R. BRUMFIELD**                                    **CIVIL ACTION**

                                                            **NO. 21-870**

                                                            *consolidated with*

**VERSUS**

                                                            **NO. 21-898**

**DARRYL VANNOY, ET AL.**                          **SECTION: "R"(1)**

<u>**REPORT AND RECOMMENDATION**</u>

Petitioner, Marlone R. Brumfield, a Louisiana state prisoner, filed these consolidated federal applications seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the applications be **DISMISSED WITH PREJUDICE**.

On February 18, 2016, petitioner was convicted under Louisiana law of aggravated obstruction of a highway of commerce (Count 1) and possession of cocaine (Count 2).[1] On July 11, 2016, he was found to be a fourth felony offender, and he was sentenced as such to a term of life imprisonment on Count 1 and a term of twenty years' imprisonment on Count 2. It was ordered that those sentences be served concurrently and without benefit of probation or suspension of sentence.[2] On direct appeal, the Louisiana First Circuit Court of Appeal affirmed both convictions, his habitual offender adjudication, and his sentence on Count 2. In addition, the Court of Appeal amended his sentence on Count 1 "to include a restriction of parole" and then affirmed that

---

[1] State Rec., Vol. 3 of 8, trial transcript, p. 535; State Rec., Vol. 1 of 8, minute entry dated February 18, 2016; State Rec., Vol. 1 of 8, jury verdict forms.
[2] State Rec., Vol. 3 of 8, transcript of July 11, 2016; State Rec., Vol. 1 of 8, minute entry dated July 11, 2016; <u>see also</u> State Rec., Vol. 1 of 8, Reasons for Habitual Offender Adjudication dated July 18, 2016.

sentence as amended.[3]  The Louisiana Supreme Court thereafter denied his related writ application on June 15, 2018.[4]

Petitioner also filed an application for post-conviction relief with the state district court.[5] That application was denied on September 17, 2019,[6] and his related writ applications were likewise denied by the Louisiana First Circuit Court of Appeal on March 13, 2020,[7] and the Louisiana Supreme Court on November 4, 2020.[8]

Petitioner then filed with this Court a federal application seeking habeas corpus relief, which was docketed in Civil Action No. 21-870.  Thereafter, another such application was transferred to this Court from the United States District Court for the Middle District of Louisiana, and that transferred application was docketed in Civil Action No. 21-898.  Because both applications challenged the same state court judgment and asserted the same claims for relief, the two cases were consolidated.  In a joint response, the state waived any issues concerning timeliness and did not allege that petitioner's claims were unexhausted or procedurally defaulted; however, the state argued that relief should nonetheless be denied because the underlying claims were meritless.[9]  Petitioner filed a reply.[10]

---

[3] State v. Brumfield, 232 So. 3d 42 (La. App. 1st Cir. 2017); State Rec., Vol. 6 of 8.
[4] State v. Brumfield, 257 So. 3d 683 (La. 2018); State Rec., Vol. 6 of 8.
[5] State Rec., Vol. 6 of 8.
[6] State Rec., Vol. 6 of 8, Order Denying Application for Post-Conviction Relief dated September 17, 2019.
[7] State v. Brumfield, No. 2019 KW 1414, 2020 WL 1229841 (La. App. 1st Cir. Mar. 13, 2020); State Rec., Vol. 7 of 8.
[8] State v. Brumfield, 303 So. 3d 625 (La. 2020); State Rec., Vol. 8 of 8.
[9] Rec. Doc. 19 (Civ. Action No. 21-870).
[10] Rec. Doc. 20 (Civ. Action No. 21-870).

## **Facts**

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts in this case as follows:

> On the evening of August 26, 2015, officers with the St. Tammany Parish Sheriff's Office narcotics division utilized a "cooperating individual" (CI) to set up a controlled purchase of liquid promethazine and codeine. Defendant was the target of the investigation, and the sale was to occur in the parking lot of a Wendy's fast food restaurant on La. Hwy. 21 in Covington.
>
> Several St. Tammany Parish Sheriff's detectives parked in the area of the Wendy's in unmarked vehicles. Detectives Scott Thomas, Jason Prieto, and Roger Gottardi conducted surveillance from their vehicles located in adjacent parking lots. Detectives Bart Ownby and Jay Quinn sat inside a single vehicle in the Wendy's parking lot, intending to make contact with defendant. The CI and two unidentified detectives were located at the police station, where the CI maintained contact with defendant.
>
> Defendant arrived at the Wendy's in a white truck, and drove slowly around the parking lot. He then entered the Wendy's drive-thru line, but exited it before reaching the window. At some point while he was in the parking lot or the drive-thru line, defendant sent a text message to the CI, asking who the "white guy" was. The information regarding this text message was radioed to the detectives in the area. Shortly after sending the text message, defendant exited the Wendy's parking lot and began to drive down Stirling Boulevard.
>
> Once defendant exited the Wendy's parking lot, the detectives decided to effect a traffic stop of the vehicle. In an attempt to do so, the detectives began to maneuver their unmarked vehicles around defendant's truck to try to box it in and prevent him from fleeing. At that time, they had not activated their emergency lights or sirens. Once defendant was boxed in on three sides (front, back, and left), the detectives activated their emergency lights. In response, defendant applied the truck's brakes, causing the police vehicles to the left and front to continue onward without him. He cut from the right lane of traffic, turned through the left lane, jumped the median on La. Hwy. 21, and began to travel at a high rate of speed in the opposite direction, disregarding traffic signals. Defendant eventually entered I-12 and traveled eastbound at speeds in excess of 100 miles per hour. In doing so, he maneuvered his vehicle around several tractor-trailers and other passenger vehicles. In one particular incident, defendant cut in front of a tractor-trailer, causing it to slam on its brakes and the pursuing officers to drive on the interstate's shoulder to prevent a collision. As defendant continued to evade officers on I-12, he turned off his vehicle's headlights despite the darkness and time of day (approximately 9:45 p.m.). Defendant exited the interstate at U.S. Hwy. 190 in Covington and continued to drive at a high rate of speed, disregarding traffic signals, and driving on the shoulder and median. He reached the Claiborne Hill

area, where he sideswiped a church van that was traveling in the middle lane. He then turned onto Boston Street (U.S. Hwy. 190 Business) and then onto Lee Lane. He entered the Boston Commons parking lot, where the vehicle ultimately struck the handicapped ramp of an area business. Defendant exited the crashed vehicle and began to flee on foot, but he was soon apprehended.

After being apprehended, defendant was informed of his Miranda[FN 2] rights and Deputy T.J. Schlesinger initiated an outer clothing pat down. Deputy Schlesinger felt what appeared to be a cigarette box on defendant's lower body. He received permission from defendant to remove the box, which was located inside defendant's underwear. Deputy Schlesinger opened the box with the defendant's permission and observed a substance that later tested positive as containing cocaine. Deputy Schlesinger also found a small quantity of marijuana in defendant's back pocket. A search of the vehicle driven by defendant revealed two bottles of red liquid. Chemical analysis of the liquid in these bottles indicated that the substance was diphenhydramine (Benadryl). Defendant did not testify at trial.

[FN 2]  Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[11]

## Petitioner's Claims

In his federal applications, petitioner asserted the following claims:

1.     Petitioner was denied his right to judicial review on direct appeal;

2.     The prosecutor knowingly used false testimony to obtain the conviction;

3.     St. Tammany Parish law enforcement and the District Attorney discriminate

against African-Americans;

4.     Petitioner was convicted and sentenced under an unconstitutional statute;

5.     The state court exceeded its jurisdiction; and

6.     Petitioner received ineffective assistance of counsel.

Petitioner had asserted those same claims in the state post-conviction proceedings. The state district court denied the claims, stating simply:

Defendant filed an Application for Post Conviction Relief on July 29, 2019. The Court requested a response from the Office of the District Attorney on August

[11] State v. Brumfield, 232 So. 3d 42, 46-47 (La. App. 1st Cir. 2017); State Rec., Vol. 6 of 8.

16, 2019 which was received by this Court on September 10, 2019.  Following review of the file and the State's response, this Court concludes the defendant failed to provide any evidence or argument that would entitle him to post-conviction relief.

       Accordingly IT IS ORDERED THAT:  The Application for Post Conviction Relief is denied.[12]

The Louisiana First Circuit Court of Appeal then likewise denied petitioner relief without assigning reasons,[13] and the Louisiana Supreme Court thereafter denied his related writ application, stating: "Denied.  Applicant fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  As to his remaining claims, applicant fails to satisfy his post-conviction burden of proof.  La.C.Cr.P. art. 930.2."[14]

Because the state courts denied petitioner's claims on the merits, the strictly deferential standards of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are binding on this federal habeas court.  Under those standards, the AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002); accord Langley v. Prince, 926 F.3d 145, 155 (5th Cir. 2019) (noting that the AEDPA imposes a "relitigation bar" on claims adjudicated on the merits by the state court), cert. denied, 140 S. Ct. 2676 (2020).  The applicable standards of review are as follows.

---

[12] State Rec., Vol. 6 of 8, Order Denying Application for Post-Conviction Relief dated September 17, 2019.
[13] State v. Brumfield, No. 2019 KW 1414, 2020 WL 1229841 (La. App. 1st Cir. Mar. 13, 2020); State Rec., Vol. 7 of 8.
[14] State v. Brumfield, 303 So. 3d 625 (La. 2020); State Rec., Vol. 8 of 8.

As to pure questions of fact, factual findings are presumed to be correct and a federal court must give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 572 U.S. 415, 426 (2014). However, a federal habeas court must be mindful that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694; accord Harrington v. Richter, 562 U.S. 86, 102-03 (2011) ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." (quotation marks omitted)); Langley, 926 F.3d at 156 ("The Supreme Court has repeatedly held that it is not enough to show the state court was wrong."); Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). Therefore:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement. In other words, the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.

Langley, 926 F.3d at 156 (citations and quotation marks omitted). "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief." Id. at 170.

Further, the Supreme Court has expressly cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be

7

> undermined if habeas courts introduced rules not clearly established under the guise
> of extensions to existing law.

Woodall, 572 U.S. at 426 (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

In summary, "AEDPA prevents defendants – **and federal courts** – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 779 (2010) (emphasis added).  The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein.  Woodall, 572 U.S. at 417.

Utilizing those strictly deferential standards of review, the undersigned reviewed petitioner's claims and, for the following reasons, found them all wanting.

### 1. Petitioner was Denied His Right to Judicial Review on Direct Appeal

In this claim, petitioner argued that his right to judicial review was violated because the trial transcript was incomplete.  Specifically, he noted that certain discussions at the bench were "off the record," that the "charge conference" was not transcribed, and that a discussion between the prosecutor and a narcotics agent during a recess was not transcribed.  He also complained that the police reports, the affidavit of probable cause, and the plea colloquies from his prior convictions were not included in the appellate record.

Regarding such claims, the United States Fifth Circuit Court of Appeals has explained:

> The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. Accordingly, if a State has created appellate courts as an integral part of the system for finally adjudicating the guilt or innocence of a defendant, the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution. However, a complete verbatim transcript is not always required to ensure that a defendant's right to meaningful appellate review is satisfied. Accordingly, the record is adequate for full appellate review so long as it contains the portions **necessary to address the alleged errors below**. Moreover, claims based on incomplete transcripts must show that the absence of such a transcript prejudiced the defendant's appeal.

Higginbotham v. Louisiana, 817 F.3d 217, 222 (5th Cir. 2016) (emphasis added; citations, quotation marks, and ellipsis omitted). In other words, to have a viable claim regarding a purportedly incomplete transcript, a petitioner must show that the missing portions were **germane to the claims he asserted in his appeal**. See Kunkle v. Dretke, 352 F.3d 980, 985 (5th Cir. 2003) ("[A] State need not waste its funds providing for free those parts of the transcript that are not 'germane to consideration of the appeal.' (quoting Draper v. Washington, 372 U.S. 487, 495 (1963)); Schwander v. Blackburn, 750 F.2d 494, 497-98 (5th Cir. 1985); Coleman v. Cain, Civ. Action No. 07-3655, 2014 WL 348541, at *20-21 (E.D. La. Jan. 3, 2014).

Here, petitioner does not allege, much less establish, that any untranscribed portions of the proceedings were relevant to – and necessary for full review of – the claims he asserted on direct appeal. Rather, he appears to suggest that the untranscribed portions might have revealed **other errors** in the proceedings which would have given him grounds for **additional** claims for appeal. But the right in question simply does not extend that far. On the contrary, it is clear that a state is not "state required to furnish complete transcripts so that the defendants may conduct 'fishing expeditions' to seek out possible errors at trial." Kunkle, 352 F.3d at 985-86; accord Johnson v. Cooper, Civ. Action No. 11-1382, 2013 WL 4548526, at *19 (E.D. La. Aug. 27, 2013) ("The fact

that petitioner believes that he may have uncovered a constitutional error if he had been provided with a transcript of the bench conferences is clearly insufficient for the purpose of attaining federal habeas corpus relief."); Womack-Grey v. Warden, Louisiana Correctional Institute for Women, Civ. Action No. 08-3956, 2010 WL 3473081, at *8 (E.D. La. Apr. 14, 2010) ("Petitioner contends that a complete transcript is necessary so that she can look for errors. However, it is well settled that the State is not required to furnish complete transcripts so that the defendants may conduct 'fishing expeditions' to seek out possible errors at trial. The law also does not require a more complete transcript when a petitioner is completely unable to indicate one specific error committed during the portions of trial not included in the record." (citation, quotation marks, and ellipsis omitted)), adopted, 2010 WL 3473811 (E.D. La. Aug. 27, 2010).

### 2. Prosecutor Knowingly Used False Testimony to Obtain the Conviction

In this claim, petitioner alleged that the prosecutor presented false testimony at trial. Clearly, due process may be violated if a prosecutor knowingly presents false testimony at trial or allows untrue testimony to go uncorrected. Giglio v. United States, 405 U.S. 150, 153 (1972); Napue v. Illinois, 360 U.S. 264, 269 (1959). However, in order to prevail on such a claim, a petitioner "must show 1) the testimony was actually false, 2) the state knew it was false, and 3) the testimony was material." Canales v. Stephens, 765 F.3d 551, 573 (5th Cir. 2014) (quotation marks omitted); accord Devoe v. Davis, 717 F. App'x 419, 426 (5th Cir. 2018).

Here, petitioner points to four instances at trial where allegedly false testimony was presented by the prosecutor. The Court will separately address each instance.

### a. Testimony Concerning the Text Messages and the CI's Location

Through a "cooperating individual" ("CI"), officers set up a drug deal with petitioner to take place in a Wendy's parking lot. Petitioner argues that Detectives Scott Thomas and Bart Ownby gave conflicting testimony at trial concerning the Wendy's transaction and, therefore, one of them was obviously lying.

Detective Thomas testified that six plain-clothed officers were stationed in the parking lot in three two-man unmarked cars, one of which matched the description of the purported buyer's vehicle. Detective Thomas testified:

> When [petitioner] gets into the Wendy's parking lot, he's driving extremely slow as if he's looking for something. Once he gets close to the vehicle description that we gave one of our unmarked units, he slows down almost to a stop, maybe comes to a complete stop. He sends a text message to the cooperating individual asking who the white guy is. And at that point we knew that this was the guy we were looking for.[15]

Detective Ownby likewise testified as to the foregoing text exchange between petitioner and the CI, and he testified that the CI was texting petitioner from the sheriff's department complex.[16]

Petitioner argues:

> The only was [sic] Det. Ownby and other detectives can say what the text message said, they either had to see said text, the only way that could have happened, if the cooperating individual was in the car with the detectives at the Wendy's parking lot, which shows and proves all detectives testified to such at trial, lied under oath and perjured themselves. Petitioner never text-ed [sic] anyone he called the guy on his cell phone so that is why they could not retrieve any text off petitioner's phone or the so called cooperating individual phone.[17]

---

[15] State Rec., Vol. 2 of 8, trial transcript, p. 342.
[16] State Rec., Vol. 3 of 8, trial transcript, p. 412.
[17] Rec. Doc. 1-1, p. 7.

If petitioner is contending only that there were **no texts** (and that he and the CI were communicating **solely** through voice calls), he has not established the truth of that contention. Specifically, he has not provided any evidence showing that only voice calls took place – and that no texts were exchanged.  In the absence of such evidence, he has not even shown that the detectives were lying about the text exchange, much less that the prosecutor knew they were lying.

If petitioner is also suggesting that Ownby was lying when he testified that the CI was at the sheriff's department complex, nothing reasonably suggests that was a lie.  Petitioner appears to argue that the CI necessarily was present **with the detectives at Wendy's** since the detectives knew the content of the texts (which, again, he says did not exist), but that simply is not so.  A more reasonable explanation, and one actually supported by the trial testimony,[18] is that the CI was at the sheriff's department complex with an officer, who was, in turn, relaying information to the detectives at Wendy's.

### b. Other Testimony Concerning the CI

Petitioner also challenges the fact that the CI was referred to as both a "cooperating individual" and a "confidential informant" at trial.  Petitioner contends that the two terms, while similar, are not in fact interchangeable.  He cites no support for that contention; but, in any event, it is not determinative.

Petitioner suggests that the person in question was actually a "cooperating individual" and that the testimony referring to him as a "confidential informant" was a lie.[19]  However, even if the Court assumes that petitioner is correct in arguing that the terms "cooperating individual" and

---

[18] <u>See, e.g.</u>, State Rec., Vol. 2 of 8, trial transcript, pp. 380-81; State Rec., Vol. 3 of 8, trial transcript, pp. 402-03.
[19] Rec. Doc. 1-1, p. 8 ("Cleary, this guy should not have been called a confidential informant, when he wasn't one.").

"confidential informant" are not synonymous, he fails to explain why – and the undersigned cannot imagine why – a person could not be both.  And, more important here, petitioner has failed to establish that this person was not in fact both, and so he has not established that the testimony referring to the person as a "confidential informant" was **false**.  Again, that dooms his claim, in that actual falsity is necessary.

<u>**c. Testimony Concerning Petitioner's Offer to Cooperate**</u>

Petitioner also notes that "several detectives testified at trial, when the petitioner was apprehended he immediately stated:  'I will give you anybody you want.'"[20]  He opines:  "[S]aid statement is not true and perjured testimony.  If said statement was true, why didn't the officers allow petitioner to do the very same as the cooperating individual was doing to the petitioner?"[21]  However, obviously, the mere fact that petitioner's offer was not accepted in no way proves that no such offer was made.  Because petitioner once again has not established that the testimony in question was in fact **false**, his claim necessarily fails.

<u>**d. Testimony Concerning the Church Van**</u>

During the police chase in this case, petitioner side-swiped a church van.  At trial, Detective Thomas testified that the van "had some nuns in it."[22]  In this instance, petitioner is correct:  there were no nuns.  However, even petitioner acknowledges that the prosecutor then did "what is required by law,"[23] i.e. he corrected the erroneous testimony.  Specifically, he called as a witness the driver of the van, Glenn Alvin Bradley, who testified that he was "the head deacon for the

---

[20] <u>Id.</u>
[21] <u>Id.</u>
[22] State Rec., Vol. 2 of 8, trial transcript, p. 349.
[23] Rec. Doc. 1-1, p. 9.

[Covington] Seventh Adventist Church" and that the van was occupied by him and his wife.[24]  The prosecutor further expressly acknowledged in his closing argument that the testimony was erroneous:

> And I know some of you have probably heard one of the officer's testimonies that were nuns and the deacon came and said, oh, it was me and my wife.  But he also said he was Seventh-day Adventist, the women dressed in long clothing, very modest.  That officer wasn't necessarily stopping to see who was in the vehicle.  He was continuing on his pursuit because Mr. Brumfield was still evading them.[25]

Because petitioner expressly concedes that the prosecutor corrected the error, he presumably is not contending that the misstatement at issue warrants federal relief.  However, in any event, it clearly does not.  Not only was the erroneous testimony corrected, the misstatement simply was not "material."  "[T]estimony is material if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  Canales v. Stephens, 765 F.3d 551, 573 (5th Cir. 2014) (quotation marks omitted).  The religious denomination of the van's occupants could not have legitimately affected the jury's verdict.

### 3. Racial Discrimination

In this claim, petitioner alleged that African-Americans are prosecuted more often (and more severely) due to their race.  However, petitioners have difficulty prevailing on such claims because, "[g]enerally, the government has broad discretion in determining who to prosecute." United States v. Sparks, 2 F.3d 574, 580 (5th Cir. 1993).  Moreover, the law employs a "presumption" that prosecutorial decisions are made in "good faith," and a petitioner asserting a selective prosecution claim has a burden "to **present clear evidence** showing that the prosecutor's

---

[24] State Rec., Vol. 3 of 8, trial transcript, pp. 452-53.
[25] Id. at p. 494.

decisions had both a discriminatory effect and a discriminatory motive or purpose." Broadnax v. Lumpkin, 987 F.3d 400, 413 (5th Cir. 2021) (emphasis added); accord Sparks, 2 F.3d at 580 ("[A petitioner] bear[s] a heavy burden in [his] attempt to demonstrate unconstitutional selective prosecution. A prima facie showing of unconstitutional selective prosecution requires [a petitioner] first to demonstrate that [he was] singled out for prosecution while others similarly situated who committed the same crime were not prosecuted. [A petitioner] next must show that the government's discriminatory selection of [him] for prosecution was invidious or done in bad faith – i.e., that the government selected its course of prosecution 'because of,' rather than 'in spite of,' its adverse effect upon an identifiable group." (citation omitted)); United States v. Jackson, 22 F. Supp. 3d 636, 646-47 (E.D. La. 2014). Further, "statistical evidence alone does not establish that the decisionmakers in *his* case acted with discriminatory purpose." Broadnax, 987 F.3d at 414.

Here, petitioner clearly failed to meet his burden. He did not identify a single "similarly situated" person of any race who was treated differently under similar facts, and he offered no evidence that would support an inference that racial considerations played a part in his particular prosecution.

Perhaps recognizing that evidentiary deficit, he instead suggested that he should be allowed to "propound discovery" to ferret out proof of discrimination to support his claim.[26] However, "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." Bracy v. Gramley, 520 U.S. 899, 904 (1997). Rather, Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "A judge

---

[26] Rec. Doc. 1-1, p. 10.

may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of the discovery."

Here, even if petitioner conducted discovery and secured evidence supporting his selective prosecution claim, this Court would be barred from considering that evidence on habeas review because it was never presented to the state courts.  See Cullen v. Pinholster, 563 U.S. 170, 185 (2011) ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of [28 U.S.C.] § 2254(d)(1) **on the record that was before that state court**." (emphasis added)).  Where, as here, discovery would result only in evidence which would be barred by Pinholster, a petitioner cannot show "good cause" to conduct such discovery. See, e.g., Davis v. Bobby, No. 2:10-cv-107, 2017 WL 2544083, at *3 (S.D. Ohio June 13, 2017) ("Pinholster precludes consideration of new evidence developed in federal habeas corpus as to claims that the state courts adjudicated on the merits.  That strongly suggests to this Court that Pinholster's holding necessarily informs any determination as to whether discovery is warranted. It also begs the question, 'How can good cause exist to conduct discovery that, as a matter of law, cannot be used?'  Indeed, [Supreme Court precedent] permits courts to permit discovery only where specific allegations before the court show reason to believe that the petitioner may, if the facts are more fully developed, be able to demonstrate that he is entitled to relief.  Put simply, unusable evidence cannot lead to relief." (citations, quotation marks, brackets, and ellipsis omitted)).

### 4. Petitioner was Convicted and Sentenced Based on an Unconstitutional Statute

Petitioner was convicted of aggravated obstruction of a highway of commerce.  Louisiana law defines that offense as follows:  "Aggravated obstruction of a highway of commerce is the

intentional or criminally negligent placing of anything or performance of any act on any railway, railroad, navigable waterway, road, highway, thoroughfare, or runway of an airport, wherein it is foreseeable that human life might be endangered." La. Rev. Stat. Ann. § 14:96. Petitioner claims that the statute is unconstitutional because it is "vague, overboard [sic], ambiguous, and doesn't include interstate in the statute."[27] Specifically, he argues that § 14:96 fails to provide "fair notice" of what conduct is prohibited, and, worse, is worded so broadly that courts could find that it prohibits virtually any reckless conduct occurring on a roadway.

It is true that "[a] conviction may be unconstitutional if it is obtained under a statute so vague that it does not provide adequate notice of what conduct will be deemed criminal." Springer v. Coleman, 998 F.2d 320, 322 (5th Cir. 1993). However, "a petitioner will not be permitted to challenge a statute for imprecision **if his own conduct is clearly within the core of proscribed conduct**. Such a petitioner has no standing to complain about the vagueness of a law *as applied* to the conduct of others." Ferguson v. Estelle, 718 F.2d 730, 735 (5th Cir. 1983) (boldface emphasis added).

That is clearly the case here. As noted, petitioner's conduct in this case included: "cut[ting] from the right lane of traffic, turn[ing] through the left lane, jump[ing] the [highway] median"; then "travel[ling] at a high rate of speed in the opposite direction, disregarding traffic signals," "eventually enter[ing] [the interstate] and travel[ling] … at speeds in excess of 100 miles per hour," while "maneuver[ing] his vehicle around several tractor-trailers and other passenger vehicles" and "turn[ing] off his vehicle's headlights despite the darkness and time of day (approximately 9:45

---

[27] Rec. Doc. 1-1, p. 11.

p.m.)"; and then "exit[ing] the interstate … and continu[ing] to drive at a high rate of speed, disregarding traffic signals, and driving on the shoulder and median."[28]

It simply cannot be said that § 14:96 is so imprecise that it failed to give petitioner "fair notice" that the foregoing conduct would fall within its prohibition against acts on roadways "wherein it is foreseeable that human life might be endangered." For him to suggest otherwise beggars belief.[29]

### 5. The State Court Exceeded Its Jurisdiction

In this claim, petitioner argued that the bill of information was defective and, as a result, the state court exceeded its jurisdiction by allowing the prosecution to go forward. The sufficiency

---

[28] State v. Brumfield, 232 So. 3d 42, 46 (La. App. 1st Cir. 2017); State Rec., Vol. 6 of 8.

[29] Moreover, in any event, petitioner's claim falters for another reason as well:  his fear that § 14:96 is so susceptible to discriminatory use by law enforcement that it poses void-for-vagueness concern is overstated. The United States Supreme Court has explained:

> As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and **in a manner that does not encourage arbitrary and discriminatory enforcement.** Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, … **the more important aspect of vagueness doctrine is not actual notice, but the other principal element of the doctrine – the requirement that a legislature establish minimal guidelines to govern law enforcement.** Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections.

Kolender v. Lawson, 461 U.S. 352, 357-58 (1983) (citations, quotation marks, and brackets omitted). That is not the case with § 14:96. The Louisiana Supreme Court has rejected the argument that the statute is so vague that it could be interpreted in a manner that "would make virtually all traffic offenses felonies." See State v. Cox, 5 So. 3d 869, 871 (La. 2009). That court explained:

> [Louisiana law requires] that provisions of the criminal code "shall be given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision." See LSA-R.S. 14:3, which guides the interpretation and application of criminal code provisions. **The language of the statute, which requires the State to prove intent or criminal negligence** in placing of anything or performance of any act on a highway **where it is foreseeable that human life might be endangered, serves to limit the application of the statute**.

Id. at 873 (emphasis added).

of a state charging instrument is a matter for federal habeas relief only if it can be shown that the charging document was so defective that it deprived the state court of jurisdiction.  McKay v. Collins, 12 F.3d 66, 68 (5th Cir.), reh'g granted in part on other grounds sub nom. Williams v. Collins, 12 F.3d 70 (5th Cir. 1994) (per curiam).  However, the United States Fifth Circuit Court of Appeals has observed that the sufficiency of a state charging instrument is fatally defective only when there are no circumstances under which there could be a valid conviction based on that instrument, and that "determination can be made *only* by looking to the law of the state."  Liner v. Phelps, 731 F.2d 1201, 1203 (5th Cir. 1984) (internal quotation marks omitted).

Moreover, of particular import here:  "Where the state courts have held that [a charging instrument was] sufficient under state law, a federal court need not address that issue."  McKay, 12 F.3d at 68.  That includes when the issue was "squarely presented to and decided by the state's highest court when the petitioner present[ed] the argument in his application for postconviction relief and the state's highest court denies that application without written order."  Evans v. Cain, 577 F.3d 620, 624 (5th Cir. 2009).

Here, petitioner's claim challenging the sufficiency of the bill information and the trial court's jurisdiction was presented to and denied by the Louisiana Supreme Court on collateral review.  Although his current argument inherently suggests that the state courts misapplied state law in rejecting his claim, such challenges to state law jurisdictional rulings are precluded in a federal habeas proceeding.  See id. at 625; see also Davis v. Craig, No. 94-50143, 1995 WL 534730, at *3 (5th Cir. July 25, 1995) ("[O]nce the state's highest court has reviewed the indictment and found it sufficient to vest jurisdiction, further review by the federal habeas court is precluded.  By denying [petitioner] relief on habeas corpus, the Texas Court of Criminal Appeals

has necessarily, though not expressly, held that [her] indictment is sufficient to vest the Texas trial

court with jurisdiction.  Thus, federal habeas review of [her] claims related to the adequacy of her

indictment is precluded." (citations omitted)).

### 6. Petitioner Received Ineffective Assistance of Counsel

Petitioner claims that his trial counsel was ineffective in several respects.  The clearly

established federal law governing such claims is Strickland v. Washington, 466 U.S. 668 (1984).

In Strickland, the United States Supreme Court held:

> A convicted defendant's claim that counsel's assistance was so defective as
> to require reversal of a conviction … has two components.  First, the defendant
> must show that counsel's performance was deficient.  This requires showing that
> counsel made errors so serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment.  Second, the defendant must
> show that the deficient performance prejudiced the defense.  This requires showing
> that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial
> whose result is reliable.  Unless a defendant makes both showings, it cannot be said
> that the conviction … resulted from a breakdown in the adversary process that
> renders the result unreliable.

Id. at 697.

When assessing whether counsel's performance was deficient, a federal court must always

be mindful that "Strickland does not guarantee perfect representation, only a reasonably competent

attorney."  Harrington v. Richter, 562 U.S. 86, 110 (2011).  Therefore, "[t]o establish deficient

performance, a person challenging a conviction must show that counsel's representation fell below

an objective standard of reasonableness."  Id. at 104 (quotation marks omitted).  Moreover, the

Supreme Court has cautioned:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is
> all too tempting for a defendant to second-guess counsel's assistance after
> conviction or adverse sentence, and it is all too easy for a court, examining
> counsel's defense after it has proved unsuccessful, to conclude that a particular act
> or omission of counsel was unreasonable.  A fair assessment of attorney

performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

Strickland, 466 U.S. at 689 (citations and quotation marks omitted).

Strickland's prejudice component is no less exacting. The Supreme Court has explained:

In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, Strickland asks whether it is reasonably likely the result would have been different. This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.

Richter, 562 U.S. at 111-12 (citations and quotation marks omitted).

Where, as here, a habeas petitioner's ineffective assistance of counsel claim was denied on the merits in the state courts, he faces even greater obstacles to obtaining relief on the claim in federal court. Because such a claim presents a mixed question of law and fact, the petitioner is entitled to federal habeas relief only if he shows that the state court decision denying the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).

Under that deferential standard of review, the determinative factor is not simply whether counsel was ineffective in the independent view of the federal court; rather, it is "whether the state

court's **application of the <u>Strickland</u> standard** was unreasonable." <u>Richter</u>, 562 U.S. at 101 (emphasis added). Therefore, "[w]hen § 2254(d) applies, the question is **not** whether counsel's actions were reasonable. **The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard**." <u>Id.</u> at 105 (emphasis added). That makes a petitioner's already difficult task even more so, because it requires the federal court to accord the state court decision "a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself." <u>Id.</u> at 101; <u>see also</u> <u>id.</u> at 105 ("The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so."). As a result, in effect, the federal court must "afford **both** the state court **and** the defense attorney the benefit of the doubt." <u>Woods v. Etherton</u>, 578 U.S. 113, 117 (2016) (emphasis added; quotation marks omitted).

For the following reasons, the Court finds that, under that doubly deferential standard, it cannot be said that relief is warranted with respect to any aspect of petitioner's ineffective assistance of counsel claim.

Petitioner first argues that his counsel was ineffective for failing to move for a mistrial when Detective Thomas testified that "one of our other detectives has dealt with [petitioner] on numerous other occasions and actually knows him through previous arrests."[30] Defense counsel immediately objected to that testimony, and the trial court sustained the objection and admonished the jury "not to consider that last answer at all."[31] The judge also recessed the trial and instructed

---

[30] State Rec., Vol. 2 of 3, trial transcript, p. 340.
[31] <u>Id.</u>

the prosecutor to advise his witnesses that "prior arrests are not something that can be gone into."[32]

However, petitioner faults his counsel for not going further and requesting a mistrial.

Louisiana law provides:

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
>
> > (1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
> > (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
> > (3) The failure of the defendant to testify in his own defense; or
> > (4) The refusal of the judge to direct a verdict.
>
> An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial.  If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

La. Code Crim P. art. 770.

Although defense counsel therefore could have legitimately moved for a mistrial, he was not necessarily ineffective for choosing not to do so.  On the contrary, a decision as to whether to move for a mistrial is one of trial strategy.  See Hatch v. Lambert, 215 F. App'x 614, 615 (9th Cir. 2006); Brooks v. Cain, Civ. Action No. 06-1869, 2009 WL 3088323, at *17 (E.D. La. Sept. 21, 2009); Franklin v. Thompson, Civ. Action No. 07-543, 2007 WL 3046642, at *12 (E.D. La. Oct. 17, 2007).  Moreover, it is clear that the strategic decisions of counsel are accorded a large measure of deference.  Indeed, as already noted *supra*, the United States Supreme Court expressly held in Strickland:  "Judicial scrutiny of counsel's performance must be highly deferential.  …  [A] court

---

[32] Id.

must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  466 U.S. at 689 (quotation marks omitted).

In the instant case, petitioner essentially argues that counsel's decision not to move for a mistrial was so wrongheaded that the state court's decision deferring to that strategic choice was necessarily unreasonable.  For the following reasons, the undersigned simply cannot agree.

Mistrials do not always benefit the defense.  For example, when a mistrial is declared and the case must tried again from scratch, there is always a risk that in the new trial a less favorable jury might be empaneled or the state might bolster and present its case more effectively.  Faced with such considerations, counsel, who knows his case and was present for the trial, is generally in the best position to weigh the relative benefits of proceeding to a verdict against attempting to force a retrial by moving for mistrial.  Accordingly, a habeas court, whose knowledge of a case is limited to a cold record, should second-guess trial counsel's decisions on such matters only in the most egregious circumstances.  Here, the defense's objection was immediately sustained, the jury was admonished to disregard the testimony, and the prosecutor was scolded to instruct his witnesses that such testimony was not permissible.  In light of those curative measures, counsel's decision not to insist on a mistrial based on this one fleeting comment cannot be said to have permeated the entire trial with obvious unfairness.  Therefore, this component of petitioner's ineffective assistance of counsel claim should be rejected.

Petitioner next contends that his counsel was ineffective for making three allegedly prejudicial comments:

- He faults counsel for saying in his opening statement, "Mr. Brumfield was getting a hamburger at Wendy's when four, at least four, burley white guys, late at night, in some ragged out cars with lights decide to chase him."[33]  Petitioner opines that "once petitioner's counsel brought race in the trial, all defendant's chances of being found not guilty vanished," in that "it then became a race issue, being counsel had insulted the white jury, by alleging that their race of people jumped out on a black man …."[34]

- He faults counsel for stating during voir dire, "Now, I know a lot of you, and I am too concerned about our budget situation.  And I know a lot of you have probably been reading a lot about what – where we can cut, about how Louisiana has the highest per capita prison rate in the country."[35]  Petitioner argues that those concerns were in no way related to this case and, "by counsel talking about high incarceration rate in Louisiana, he is basically saying my client is guilty as charged, no need for a trial in this matter, but don't convict him to make the incarceration rate one more person on the already high rate.  Once the jury had heard such, it had already determined petitioner was guilty as charged."[36]

- He faults counsel for saying in his opening statement, "And knowledge that he had the cocaine on him is an element of the crime.  If you find that he had the cocaine on him and that it was cocaine, then I put it to you, he had no idea it was there."[37]  Petitioner argues this was prejudicial because the eventual testimony established that the cocaine was "in a cigarette pack,

---

[33] State Rec., Vol. 2 of 8, trial transcript, p. 331.
[34] Rec. Doc. 1-1, p. 20.
[35] State Rec., Vol. 2 of 8, trial transcript, p. 288.
[36] Rec. Doc. 1-1, p. 21.
[37] State Rec., Vol. 2 of 8, trial transcript, p. 333.

not on petitioner's person," and, therefore, the jury would surmise that defense counsel was lying to them or trying to trick them. [38]

It was not unreasonable for the state courts to determine that the foregoing statements were not so beyond the pale that counsel's performance was deficient or that petitioner was prejudiced. As to counsel's statement that an African-American might naturally flee when being chased by a group of unidentified Caucasians, it is entirely speculative – and highly unlikely – that a Caucasian juror would interpret such as statement to be an "insult" to his or her race. On the contrary, it is more likely that many Caucasians would deem such flight completely understandable given this country's history of racially-motivated violence. As to counsel's statement touching on potential juror's feelings about the state's high incarceration rate and its attendant costs, that does not strike the undersigned as an inappropriate subject for voir dire examination. And, contrary to petitioner's suggestion, neither that statement nor the one regarding the cocaine could be reasonably construed by the jurors as either a concession of petitioner's guilt or as evidence of counsel's untrustworthiness.

Petitioner next argues that "no competent attorney or no attorney in his right mind would allow his client to go to trial, and the trial court didn't have jurisdiction to proceed on one of the charges, or allow the prosecutor to use perjured testimony and information, or an unconstitutional charge/offense ...."[39] On this argument, two points must be made: First, obviously, defense counsel does not have the ability to prevent a trial unilaterally. Second, in any event, as already thoroughly explained herein, the trial court did not lack jurisdiction, it has not been established

---

[38] Rec. Doc. 1-1, p. 21.
[39] Id.

that there was uncorrected perjury, and the offense in question was not unconstitutional.  Those contentions are frivolous, and that fact does not change simply by recasting them as components of an ineffective assistance claim.

Petitioner also contends that his counsel was ineffective for failing to file a motion to quash the bill of information on the grounds it was defective.  However, as already explained *supra*, the state courts determined that the bill of information was not defective under state law.  Therefore, a motion to quash would have been meritless.  It is beyond cavil that counsel cannot be considered ineffective for failing to make a meritless motion.  United States v. Gibson, 55 F.3d 173, 179 (5th Cir. 1995) ("Counsel is not required by the Sixth Amendment to file meritless motions."); see also United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."); Sones v. Hargett, 61 F.3d 410, 415 n.5 (5th Cir. 1995) ("Counsel cannot be deficient for failing to press a frivolous point.").

Lasty, petitioner also appears to suggest that counsel's errors should be considered cumulatively.  However, "[t]he [United States] Supreme Court has never squarely held that the cumulative error doctrine governs ineffective assistance of counsel claims."  Hill v. Davis, 781 F. App'x 277, 280-81 (5th Cir. 2019); accord Chester v. Vannoy, Civ. Action No. 16-17754, 2018 WL 2970912, at *52 (E.D. La. June 11, 2018) ("Although the U.S. Supreme Court's use of the plural 'errors' in the prejudice context suggests Strickland's prejudice prong should be evaluated cumulatively, this Court cannot say such a requirement is clearly established by U.S. Supreme Court precedent.").  In any event, where, as here, a petitioner has failed to prove that his counsel

was ineffective in **any** respect, "there is nothing to cumulate." Villaneuva v. Stephens, 555 F. App'x 300, 308 (5th Cir. 2014); accord United States v. Thomas, 724 F.3d 632, 648 (5th Cir. 2013) ("[T]here is no precedent supporting the idea that a series of 'errors' that fail to meet the standard of objectively unreasonable can somehow cumulate to meet the high burden set forth in Strickland."); Pondexter v. Quarterman, 537 F.3d 511, 525 (5th Cir. 2008) ("[T]he district court noted that '[m]eritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised'. We agree."); United States v. Hall, 455 F.3d 508, 520 (5th Cir. 2006) ("Our clear precedent indicates that ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions."); Miller v. Johnson, 200 F.3d 274, 286 n.6 (5th Cir. 2000) ("[Petitioner] has not demonstrated error by trial counsel; thus, by definition, [petitioner] has not demonstrated that cumulative error of counsel deprived him of a fair trial."). As the United States Fifth Circuit Court of Appeals noted with respect to analogous claims of cumulative error: "Twenty times zero equals zero." Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987).

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He clearly has not made that showing in the instant case. Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

## RECOMMENDATION

It is therefore **RECOMMENDED** the federal applications for habeas corpus relief filed by Marlone R. Brumfield be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this 22nd day of February, 2022.


**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**